**UNITED STATES of America, Plaintiff,**

v.

**Henry E. PEELLE, Inez Beatty Peelle, Inez Beatty Peelle, Guardian of the Person and Property of Henry E. Peelle, Quinta Company, Inc., Robert B. Peelle, Conservator of the Estate of Henry E. Peelle, and Chase National Bank of New York, Defendants.**

Civ. A. No. 16381.

United States District Court
E. D. New York.
Feb. 4, 1958.

Cornelius W. Wickersham, Jr., U. S. Atty., Eastern District of New York, Brooklyn, N. Y., for plaintiff. Robert J. Grimmig, Asst. U. S. Atty., Brooklyn, N. Y., and Irwin J. Harrison, Asst. U. S. Atty., Great Neck, N. Y., of counsel.

John R. Bartels, New York City, and William H. MacTye, Miami, Fla., for defendants, Henry E. Peelle and Inez Beatty Peelle.

Milbank, Tweed, Hope & Hadley, New York City, for defendant, Chase Manhattan Bank, as Trustee (named as Chase National Bank of New York), William Eldred Jackson and Janet P. Kane, New York City, of counsel.

ABRUZZO, District Judge.

The United States of America in this action is seeking to foreclose liens for federal income taxes against the defendants. The action against Henry E. Peelle involves the sum of $1,583,856.04 and covers the years 1944 through 1949. The action against Inez Beatty Peelle involves the amount of $757,514.98 with interest and penalties. Inez Beatty Peelle and Henry E. Peelle filed joint returns for the years 1948 and 1949. The plaintiff, in addition to the fixing of taxes against Inez Beatty Peelle for 1948 and 1949, due to the joint returns, seeks a judgment against her on the theory of transferee liability for the years 1944 through 1947.

Henry E. Peelle at the time of the commencement of this suit had been declared an incompetent by both a Florida court and this Court. The Probate Court, City of Westport, State of Connecticut, appointed Robert B. Peelle as Conservator of the Estate of Henry E. Peelle but as such Conservator no assets came into his hands. Inez Beatty Peelle was appointed Guardian of his person and property by a County Judge in Dade County, Florida, and she had as such committee possession of various parcels of income property for the conservation of which a Receiver was

appointed by this Court. The Receiver is now in possession of all of that property, awaiting the outcome of the instant case.

The defendant, Quinta Company, Inc., is named as a party-defendant. The suit against it was not pressed by the plaintiff and, therefore, must be dismissed.

The defendant, Chase Manhattan Bank (named as Chase National Bank of New York), was made a party to this action due to the following facts, to wit: On December 23, 1935, Henry E. Peelle made two trust agreements; both for the benefit of Inez Beatty Peelle. The bank was named as trustee. These assets are still in the possession of The Chase Manhattan Bank and the plaintiff by this suit seeks to invade these two trusts.

During the trial, counsel for the respective parties were of great assistance to the Court in that many court days of trial were saved by a stipulation which counsel entered into (Exhibit 7B). There are eight pages in this exhibit; pages 1 and 2 recite the terms of the stipulation and 3 through 8 contain the figures which the Court must pass upon as to which are taxable. This stipulation covers all of the tax years in question.

United States v. Peelle Company, D.C., 137 F.Supp. 905, was the corporate tax case. Pages of testimony from that case record (R. 432–435) were offered in evidence upon the express understanding that the Court would accept portions of the testimony so offered that were relevant to the issues in the present case and reject those portions that were irrelevant (R. 425–429).

### Plaintiff's Points

I. Henry E. Peelle's failure to report large recurring sums of income over a period of six years constitutes fraudulent tax evasion.

II. Moneys expended by the Peelle Company in payment of personal expenses of Henry E. Peelle constitute income to him.

III. The so-called "secret" corporate bank accounts were used by Henry E. Peelle for his own personal use and are, therefore, taxable.

IV. The assessments are not barred by the statute of limitations.

V. Henry E. Peelle was not incompetent during the tax years in question.

VI. The defense of embezzlement made by the defendants is inapplicable.

VII. Double taxation as claimed by the defendants is not a defense.

### Defendants' Defenses

I. The corporate funds embezzled or wrongfully appropriated do not constitute taxable income to the defendant, Henry E. Peelle.

II. The defendant, Henry E. Peelle, being incompetent, could have no intent to evade his taxes and, therefore, this action is barred by the statute of limitations.

III. The plaintiff has failed to prove any liability of the defendant, Inez Beatty Peelle, as a transferee.

The complex issues will be divided into three categories:

(1) The items on pages 3, 4, and 5 of Exhibit 7B are stipulated to be accurate and constitute additional income of Henry E. Peelle in the years 1944 through 1949, subject to the defense of incompetency.

(2) The items on pages 6, 7 and 8 of Exhibit 7B are stipulated to be accurate, but the defendants claim all of these items cannot be charged to Henry E. Peelle. These items are also subject to the defense of incompetency.

(3) The so-called "secret" bank accounts which the defendants claim are moneys embezzled; the plaintiff claims these moneys are taxable; the defendants claim they are not.

Category (1) consists of numerous recurring items of cash income, interest, salary, rentals, director's fees and dividends from 1944 through 1949 and total $278,360.18. Outside of dividends amounting to $7,931.20, all of this sum is taxable as it was additional income to Henry E. Peelle which he was duty-bound to include in his tax returns.

As to category (2), the items have been studied carefully; some are taxable, some are not.

The Court makes the following findings:

### 1945

Lockhart, Legal Expense, $829.25—taxable

Clinchy Weaver & Co., General Insurance, $370.38—taxable

Strathmore Lodge Club, $133.70—taxable

A. W. Parry & Company, $1,415.60, represents premium paid out of the corporate funds on the life insurance policy of Inez Peelle, wife of Henry E. Peelle, and is income to the defendant, Henry E. Peelle, and taxable

E. E. Brett, $475—taxable

John Connell, $1,421.55—the Government concedes that this item is not taxable

Wilson & Toomer Fertilizer Company, $1,034.79—the Government concedes that this item is not taxable

F. L. Haines, $2,500—income to Henry E. Peelle—taxable

E. A. Bell & Co., $60—taxable

Dorothy S. Heywood, $650—this represents an outlay of corporate funds for the purchase of ten shares of Peelle Company stock from Dorothy S. Heywood. This particular certificate was subsequently transferred by the company to Marilyn Rath, Henry E. Peelle's daughter. It was given to her as a gift by Henry E. Peelle and, therefore, it is ruled as income to him and taxable

Marmon Florist, $374—taxable

Plant City Growers Association, $138.25—the Government concedes that this item is not taxable

Thomson & Nicholson, $147—the Government concedes that this item is not taxable

Bill Batcock, $800—taxable

Burdine's Department Store, $227.34—taxable

Town of Surfside, $6.57—taxable

Southern Bell Telephone Company, $9.08—taxable

### 1946

Clinchy Weaver, General Insurance, $284.75—taxable

A. W. Parry & Co., $1,415.60—taxable

A. W. Parry & Co., $797—this item represents income to Henry E. Peelle, Jr., as payment for his own personal insurance. As the Government is re-examining the tax returns of Henry E. Peelle, Jr., this is an item that properly is taxable to him and, therefore, is not taxable to Henry E. Peelle.

John Connell, $316.15—the Government concedes that this item is not taxable

Wilson & Toomer Fertilizer Company, $742.63—the Government concedes that this item is not taxable

Burdine's Department Store, $243.39—taxable

Asbury Park, Miami Beach and Manhasset telephone calls, $270.63—taxable

A. E. Debevoise, $15—the Government concedes that this item is not taxable

Clinchy Weaver & Co., $48.40—taxable

Commissioner of Motor Vehicles, $69—the Government concedes that $35 of that amount is not taxable. The balance of $34 was for the benefit of John W. Peelle and is taxable to him and not to Henry E. Peelle

$2,192.40 is a miscellaneous credit. The company books indicate that this amount was credited to Henry E. Peelle's account in return for an automobile that he turned over to the company and is not taxable

Richmond Fireproof Door Company Credit, $5,004—the checks of Richmond, a subsidiary of the Peelle Company, controlled by Henry E. Peelle, indicate that checks in that amount were made to the names of two persons now deceased. The names of the deceased were altered so that the checks were made payable to Henry E. Peelle. This item is income to him and is, therefore, taxable

Exhibit 34 shows the following items:

Opening balance January 1, 1946, $2,900

Credits at the end of 1946, $10,976.68

In 1948 there were five further credits,

to wit: $5,300; $10,000; $15,000; $1,300; and $363.08

In 1949 there was a credit of $103.37 The total credits of this exhibit show an amount of $43,043.13. The testimony indicates that Henry E. Peelle was not entitled to any of these credits. However, Henry E. Peelle withdrew as a result of the credits in Exhibit 34 the following amounts: $7,500; $7,500; $5,757; $3,000; $200, and $1,000, making a total of $24,957 for which Henry E. Peelle is taxable.

The balance of this over-all account under Exhibit 34, to wit, $18,086.13, as of December 31, 1949, is not taxable. Henry E. Peelle was not entitled to any of the moneys included in this exhibit and, while there is still a credit balance due Henry E. Peelle in the sum of $18,086.13, Richmond has a clear legal defense to this amount and, therefore, it is ruled that that particular credit is not taxable.

Richmond Fireproof Door Company notes, $15,587.50—these notes it appears were given by Richmond to Henry E. Peelle without any semblance of consideration. The books so show and there is no dispute as to that. There is an involved transaction between the Peelle Company and the Richmond Company out of which these notes flow. Nevertheless, as it is impossible for Henry E. Peelle to collect on these notes, this sum of $15,587.50 is clearly not taxable. The Court might state that these notes are very old notes, have not been presented for payment, nor have they as yet been paid.

### 1947

Shepard Broad, Legal Expense, $375—taxable

Chase Federal & Loan, $170—taxable

Clinchy Weaver & Co., $9.92—taxable

First Bank Credit, $1,348.68—taxable

Miami Beach First National Bank, $1,372.63—taxable

Shepard Broad, $125—taxable

Chase Federal & Loan, $170—taxable

Chase Federal & Loan, $170—taxable

Heywood Floor Company, $1,977.81—taxable

A. Hornung, $177—taxable

W. & J. Sloane, $1,040.48—taxable

E. E. Brett, $986—taxable

John Connell, $509—the Government concedes that this item is not taxable

E. A. Bell & Company, $22.50—taxable

Plant City Growers Association, $299.63 —the Government concedes that this item is not taxable

Thomson & Nicholson, $240.62—the Government concedes that this item is not taxable

Asbury Park, Miami Beach and Manhasset telephone calls, $290.07—taxable

A. E. Debevoise, $60—the Government concedes that this item is not taxable

Clinchy Weaver & Company, $20—taxable

R. E. Rath, $627—it appears that this amount was turned over to Rath, Henry E. Peelle's son-in-law, apparently for commissions. The books do not reflect the nature of the transactions from which these commissions flowed. It was paid by direction of Henry E. Peelle and must be ruled income to him and, therefore, taxable

A. Hornung, $321.90—taxable

Lambert's, $500—taxable

True Color Paint, $196.75—taxable

Mark Cross Company, $52.80—taxable

$2,400.97, credit to the account of Henry E. Peelle. The books contain an entry that an automobile was turned over to the Peelle Company by Henry E. Peelle, and it is conceded that the Receiver found five cars belonging to the Peelle Company; therefore, this item is not taxable

### 1948

Lockhart, Legal Expense, $125—taxable

Shepard Broad, $750—taxable

Redfern Farrell, $1,500—taxable

Clinchy Weaver & Co., $1,459.10—taxable

First Bank Credit, $1,244.40—taxable

Miami Beach First National Bank, $297.-30—taxable

Shepard Broad, $125—taxable

Chase Federal and Loan, $2,040—taxable

T. R. Gravely, $250—taxable

New York Life Insurance, $704.50—this amount represents an insurance premium for Robert B. Peelle's insurance, and as his tax returns are being examined this item should be charged as income to him, and not taxable to Henry E. Peelle

Clinchy Weaver, $236.16—taxable

D. A. G. Gardner, $31.76—taxable

Theodore Benz, $255.86—taxable

Ludman Corporation, $2,352.28—taxable

Henry Thompson, $168—the Government concedes that this item is not taxable

R. H. Mount, $239.21—taxable

A. W. Parry & Company, $1,415.60—appears in the joint return of Inez and Henry E. Peelle so it is taxable to both

John Connell, $451.55—the Government concedes that this item is not taxable

E. A. Bell & Company, $60—taxable

Plant City Growers Association, $310.35 —the Government concedes that this item is not taxable

Asbury Park, Miami Beach and Manhasset telephone bills, $569.11—taxable

R. E. Rath, $285—taxable

A. Hornung, $520.35—taxable

A. L. Wilcox, $140—taxable

F. Lowry Wall, $125—the Government concedes that this item is not taxable

Bank of Manhattan, $513.75—taxable

L. Feldman, $385—the Government concedes that this item is not taxable

Baldwin Insurance Agency, $96.69—this item represents an insurance premium for Henry E. Peelle, Jr.'s, insurance, and as his tax returns are being examined this item should be charged as income to him, and not taxable to Henry E. Peelle

Blysma & Brain, $378—taxable

Long Island Lighting Company, $25.34—taxable

Jersey Central Power & Light Company, $9.76—taxable

H. P. Coates, $191—it has not been established what this item represents and, therefore, is not taxable

People's Water & Gas Company, $20.40—taxable

Florida Light Company, $5.85—taxable

V. Bath Club, $150—taxable

Croton Hotel, $216.50—taxable

Eastman Kodak Company, $144.93—taxable

Sara S. Pitcher, $2,500—this is similar to the previously noted stock transaction in which corporate stock was purchased and was then transferred to Henry E. Peelle's daughter and is, therefore, taxable

In 1948 there also appear items of $200; $3,540; $2,583.42; $1,633.79; $454.10; and $549.08, moneys spent by Henry E. Peelle, individually, and are, therefore, taxable

Hilo Varnish check, $2,500—this particular check for rent which belonged to the Peelle Company was used for Henry E. Peelle's own purposes and deposited in his own personal account and is taxable

$250, dividends on securities owned by the Peelle Company—taxable

### 1949

Lockhart, Legal Expense, $1,618.93—taxable

Shepard Broad, $375—taxable

L. V. Storandt, $275—taxable

Daly, Dines & White, $500—taxable

Clinchy Weaver, General Insurance, $532.67—taxable

E. A. Bell & Company, $69—taxable

New York Life Insurance Company, $4,-337.75—represents premiums paid on life insurance policies of Henry E. Peelle's grandchildren and son-in-law —taxable

Miami Beach First National Bank, $1,-298.50—taxable

Chase Federal & Loan, $1,530—taxable

Southern Bell Telephone Company, $146.-49—taxable

$5,180.19, Henry E. Peelle's additional income tax for the year 1947—taxable (he paid his own personal taxes with a corporate check)

Lindstrom Rhodes, $4,978.10—is a part of the "secret" bank accounts that has been explored under that point and is not taxable

A. W. Parry & Co., $1,415.60—taxable

Asbury Park, Miami Beach and Manhasset telephone calls, $565.94—taxable

A. E. Debevoise, $75—the Government concedes that this item is not taxable

Commissioner of Motor Vehicles, $38.75—the Government concedes that this item is not taxable

J. W. Beutell Plumbing, $499.59—taxable

Town of Neptune, $107.85—taxable

J. Rosetti, $135.63—taxable

A. W. Parry Company, $2,575—it appears this item was expended for the premium on a policy of insurance of Walter Drill, Henry E. Peelle's son-in-law. He was not employed by the company at the time. The company had no interest in the policy and as it was directed to be paid by Henry E. Peelle it is taxable to him

Friends Academy, $430—taxable

A. B. Heiser, $15—the Government concedes that this item is not taxable

G. M. Ketcham Manufacturing Company, $32.90—this was for a cabinet installed in Henry E. Peelle's daughter's house. It is chargeable to him as income and, therefore, taxable

Hoyt-Catlin Company, $396.22—taxable

Oakland Country Club, $1,380—this is a membership which the company took out for the benefit of the members of the company and their customers. It is, therefore, not taxable to the extent of one-half; the other one-half, to wit, $690, is taxable to Henry E. Peelle

True Vue Company, $229.76—it has not been established what this item represents and therefore is not taxable

New York Life Insurance Company, $1,501.50—this represents premiums on life insurance policies of Henry E. Peelle, Jr., and Robert B. Peelle. As the Government is now in the process of re-examining both of these tax returns these amounts should be charged to Henry E. Peelle, Jr., and Robert B. Peelle, and are not taxable to Henry E. Peelle

There is a list of contract expenses for personal property owned by Henry E. Peelle, including one item expended for his daughter and they are taxable. The items are as follows: $11,772.85; $391; $7,052.08; $282.28; $172.10; $765.36; $3,986.14; $565.97; $5,671.50; $2,969.71; $12,954.78; $7,690.18; $98.01; $8,080.13; $759.71; and $4,484.04.

There is a miscellaneous credit to Henry E. Peelle of $6,976.60. This represents two checks, $3,462.99 and $3,513.61, Richmond Fireproof Door Company checks credited to the account of Henry E. Peelle. He used them for his own personal benefit which he had no right to do, and, therefore, these items are taxable

Dividends to the Peelle Company on stocks owned by it, the Peelle Company, but paid to Henry E. Peelle, individually, $480—taxable

$10,000 life insurance policy on the life of Morris C. Peelle, deceased. This represents an item cashed by Henry E. Peelle and put into the "secret" bank account, and is being treated as one of the items in the "secret" bank accounts

The foregoing items charged as income to Henry E. Peelle speak for themselves. All of these items are additional income of Henry E. Peelle and should have been included in his tax returns and, therefore, are taxable.

Category (3), one of the main defenses of the defendants is in respect to the so-called "secret" bank accounts which the defendants contend were embezzled by Henry E. Peelle from the company. These so-called "secret" bank accounts were maintained in three banks and were dominated and controlled by Henry E. Peelle. These accounts are treated in the corporate case, United States v. Peelle Company, supra, 137 F.

Supp. at pages 909–910. The claim of the plaintiff is that they are taxable, whereas, the defense is that they are not. There is no dispute as to the factual manner in which these accounts were set up and controlled by Henry E. Peelle. A very large amount is involved, to wit, $678,461.22.

Peelle established a system of depositing checks representing income of the company and deposited them in three separate banks, Boulevard Bank, Corn Exchange Bank and Pennsylvania Exchange Bank. These deposits were not recorded in the corporate books. Margaret F. Smith, his secretary, was the only other person in the company who knew of these "secret" bank accounts. None of the other officers had knowledge of these accounts. Originally these banks were nominated as depositories of the company. When Henry E. Peelle started to make these bank deposits which he alone controlled, there had been a nominal amount on deposit to the credit of the company which was reflected on the books of the company. The amounts involved in this tax dispute were moneys deposited in addition to the nominal moneys in these accounts. The balances were carried in the books of the company in the amount of the original deposits, therefore, hiding the large additional amounts deposited by Henry E. Peelle. He had been given the right to draw upon these bank accounts on his signature alone and had exclusive control of them. While the deposits were made by him and Miss Smith, all withdrawals were made by Peelle.

An example of the manner of the operation of this illegal device is apparent in the failure of Peelle to record on the corporate books the receipt of substantial checks from Hilo Varnish Corporation, Otis-Fenson, Ltd., Westinghouse Electric Corporation, Pace Motors, Inc., Richmond Fireproof Door Company and Otis Elevator Company. Henry E. Peelle kept a private record of these unrecorded deposits.

Another method used by Peelle was to record on the corporate accounts payment of fictitious expenses that did not actually exist. A check was drawn on the Peelle Company for these expenses and deposited in either of these three banks so that they were completely hidden. This operation commenced in 1945 and ended in 1949. There were other schemes developed by Peelle which are needless to set forth, for all other operations were deceptive, illegal and made in a manner that they were hidden from the corporate officers and deployed in such a manner that only Peelle and Miss Smith knew what moneys were taken from the Peelle Company and put into these accounts.

There is testimony from Sidney A. Kaplan, the accountant for the Receiver in the corporate case, that between 1950 and 1951 Henry E. Peelle made restitution in cash and securities to the company in excess of $678,461.22. John J. Van Benten, the accountant for the Peelle Company, corroborated Kaplan. There is no dispute as to this restitution.

In the Peelle corporate case, a judgment was directed by this Court in the sum of $953,988.87. The amount of the money that Peelle thus returned to the company was taxed as corporate income and was reflected in this judgment. This judgment was adjusted at a slight discount and the Government thus received payment of this large amount of tax.

The so-called "secret" bank accounts are treated in the opinion in the corporate case, United States v. Peelle, supra, 137 F.Supp. at the bottom of page 909 to page 917, inclusive. The amounts from 1945 to 1949, inclusive, which found their way into these three outside bank accounts are: 1945, $126,768.99; 1946, $71,223.03; 1947, $60,923.03; 1948, $196,864.88; and 1949, $222,681.29, totaling $678,461.22. All of these amounts were withdrawn by Henry E. Peelle from these corporate accounts and converted to his own personal use.

During 1951 and 1952, when audits were being made of the Peelle Company books, Henry E. Peelle returned the moneys just alluded to.

The plaintiff contends that under similar circumstances the courts have held that such appropriations constitute taxable income both to the officer and to the corporation.

The defendants contrarily contend that these so-called "secret" accounts operated under the control of Henry E. Peelle with the assistance of his secretary, Miss Smith, without the knowledge or consent of the other officers, and is in no wise to be considered as taxable income for, in fact, it was money embezzled.

It does appear in evidence that John W. Peelle, a brother of Henry E. Peelle and the secretary-treasurer of the company, did sign one check on one of these so-called "secret" accounts but, as the accounts were in operation many years before Henry E. Peelle made use of them for personal use and some corporate funds were in these accounts, it might well be that John W. Peelle understood he drew the check on moneys actually belonging to the Peelle Company and that it was being used for corporate purposes. Henry E. Peelle owned only one share of stock; his sons owned 51 per cent and John W. Peelle, the minority stockholder, owned 48 per cent.

There is no testimony that indicates that the other officers knew of what Henry E. Peelle was doing with these accounts. In the corporate case the Court ruled that the company was taxable for the amounts that he secreted in 1945 to 1949, inclusive, on the theory that in the exercise of their duties as officers they should have known of these accounts. The books were open to them and the slightest investigation by any of the officers would have indicated what Henry E. Peelle was doing. Dereliction of a duty imposed upon the directors and officers did not absolve the company from taxable income misappropriated by Henry E. Peelle.

A very important factor in the defense of the corporate case, supra, was the company's contention that the moneys returned in 1951 and 1952 should have been taxed those two years. The Court found the tax due on this so-called embezzled money for these years of 1945 through 1949. This decision worked materially to the disadvantage of the Peelle Company in that in 1951 and 1952 it had sustained losses, and had the money been credited as income in 1951 and 1952 the losses charged against the return of the money would in turn have reduced the corporate tax materially.

In support of the defendants' contention that this embezzled money is not taxable to defendant Peelle, Commissioner of Internal Revenue v. Wilcox, 1946, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752, is cited. The Tax Court had ruled that embezzled money constituted taxable income to the embezzler. The Supreme Court ruled that this was a clear-cut mistake of law. That decision pointed out (327 U.S. at page 408, 66 S.Ct. at page 549):

"* * * a taxable gain is conditioned upon (1) the presence of a claim of right to the alleged gain and (2) the absence of a definite, unconditional obligation to repay or return that which would otherwise constitute a gain. Without some bona fide legal or equitable claim, even though it be contingent or contested in nature, the taxpayer cannot be said to have received any gain or profit within the reach of Section 22(a) [26 U.S.C.A. § 22 (a)]. * * * Nor can taxable income accrue from the mere receipt of property or money which one is obliged to return or repay to the rightful owner, as in the case of a loan or credit. Taxable income may arise, to be sure, from the use or in connection with the use of such property. Thus if the taxpayer uses the property himself so as to secure a gain or profit therefrom, he may be taxable to that extent. And if the unconditional indebtedness is cancelled or retired taxable income may adhere, under certain circumstances, to the taxpayer. But apart from such factors the bare receipt of property or money wholly belonging to another lacks the essential char-

acteristics of a gain or profit within the meaning of Section 22(a)."

The decision in the Wilcox case, supra, was followed in George H. Conradson, 1946, 5 T.C.M. 112 and Agnes McCue, 1946, 5 T.C.M. 1941. In these cases the Treasury Department issued an interpretation in conformity with the Wilcox decision in the following words:

> The correct rule appears to be that the mere act of embezzlement does not of itself result in taxable income inasmuch as the owner does not lose title to the property embezzled. However, where the owner condones the taking of the property and forgives the indebtedness, taxable income may result to the embezzler, depending on the facts in the particular case.

The Circuit Court of Appeals for the Second Circuit in J. J. Dix, Inc., v. Commissioner of Internal Revenue, 223 F.2d 436, held that funds embezzled by a president of a corporation were not taxable to the president, the embezzler. The facts in that case can be summarized briefly as follows: J. J. Dix was the president who dominated a family corporation. By deceiving his son who was the only other responsible corporate executive he withdrew money from corporate accounts without the consent, coerced or otherwise, of the company and diverted the funds to his own use. The court held that the fact that he was the president did not amount to corporate consent and that his acts amounted to a simple case of embezzlement. The corporation was taxed for this embezzled money. The court ruled that Dix could not be taxed.

This Dix case, supra, follows the Wilcox case, supra, and distinguishes Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833. In the Rutkin case the Supreme Court held that moneys obtained by extortion induced by harassing demands and threats of violence is income taxable to the extortioner. The Court said (343 U.S. at page 137, 72 S. Ct. at page 575):

> "An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. * * *"

The Circuit Court of Appeals stated that it did not believe that Rutkin changed the Wilcox case. It cited with approval Marienfeld v. United States, 8. Cir., 214 F.2d 632, which held (at page 637) that the line of demarcation lies between the closely related factual situation of embezzlement and extortion which must be determined by the facts in each individual case.

The amounts taken out of these so-called "secret" bank accounts and embezzled by Henry E. Peelle and converted to his own use and later returned, therefore, are not taxable income.

■ As to categories (1) and (2), the defense of incompetency is overruled. In United States v. Peelle Company, supra, this same question was raised (137 F.Supp. at page 921). The same evidence in that case has been offered in the instant case. In the Peelle Company case the Court found Henry E. Peelle competent throughout the tax years in question and, based upon the same evidence, the Court makes the same finding in the instant case. Pursuant to this finding, the items in categories (1) and (2), therefore, are taxable except the dividends in category (1) which Henry E. Peelle did not receive.

■ The returns of Henry E. Peelle reek with fraud. A casual perusal of the sums itemized in categories (1) and (2) strongly indicates this. Peelle, over a course of the tax years in question simply took checks or cash from corporate funds for personal use or for the benefit of members of his family. His bills or their's were paid in this fashion. All of the moneys drawn under categories (1) and (2) appeared upon the books of the Peelle Company except that some attempt was made to hide some of these items. Suffice it to say, an audit of Peelle's personal books would not have shown these

items as income to him. Fortuitously, there was an audit of the corporate books sometime in 1950 to 1951 and this audit for the first time shed light on the items contained in categories (1) and (2).

The statute of limitations because of the finding of fraud is not a defense.

█ Interest and fraud penalties should be added. Bryan v. C. I. R., 5 Cir., 209 F.2d 822, certiorari denied 348 U.S. 912, 75 S.Ct. 289, 99 L.Ed. 715.

## Trust Properties

Henry E. Peelle as settlor established two trusts with Chase National Bank of New York (now The Chase Manhattan Bank and referred to herein as Chase) as trustee. Each trust is dated December 23, 1935. Both trusts provide that they are to be governed by New York Law. Chase was made a party-defendant to this action because the plaintiff alleges that the trust properties are subject to its liens. One trust embraces securities and the other insurance policies.

## The Securities Trust

Under the securities trust agreement, Henry E. Peelle transferred specified securities to Chase in trust, the income to be paid to Inez B. Peelle for life, then to Henry E. Peelle should he survive her; upon the death of the survivor, the corpus to be distributed in equal shares *per stirpes* to Henry E. Peelle's then-living descendants. By an amendment in 1944 the agreement was amended to eliminate Inez B. Peelle's power to invade the corpus after Henry E. Peelle's death. Henry E. Peelle reserved power to control investments and to alter, modify, amend or *revoke the trust*. (Italics supplied.)

## The Insurance Trust

Under the terms of the insurance trust agreement Henry E. Peelle delivered and made payable to Chase, as trustee, certain life insurance policies and their proceeds, the income to be paid to Inez for life, and upon her death the corpus was to be distributed among such of Henry's descendants as she appointed by will, or in default of exercising her pow-

er of appointment it was to be distributed in equal shares *per stirpes* among Henry E. Peelle's then-living descendants. Under the agreement Inez B. Peelle had a general power of appointment but on September 28, 1944, she duly renounced this general power, retaining only a power restricted to Henry E. Peelle's descendants. Inez B. Peelle was *given a power to withdraw policies from the trust.* (Italics supplied.) The agreement stated that by the transfer Henry E. Peelle divested himself of all legal and beneficial incidents of ownership in and to the policies of insurance and their proceeds.

In both trust agreements provision was made for payment to Chase of commissions, expenses and disbursements including counsel fees.

As of February 26, 1957, the corpus of the securities trust had an approximate market value of $192,314.20 and accumulated income amounted to $18,498.95, making a total of $210,813.15. As of the same day, the corpus of the insurance fund consisted of eight policies with an approximate cash value of $141,048.39 and $9,598.78, proceeds from one policy that matured prior to the commencement of this action, $7,500 of which is on deposit in one savings bank and the balance in another. In addition, Chase held accumulated income of $16,605.84, making a total of approximately $167,253.01. Chase contends that since the income of both trusts is payable to Inez B. Peelle this income is available only to satisfy any tax deficiencies or penalties determined against her, but not against Henry E. Peelle, under Section 7403(a) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7403(a), subject to prior payment of Chase's commissions and expenses, including counsel fees, but that neither Henry nor Inez has any property or right to property in the corpus of either trust which may be subjected in this action to payment of any tax deficiencies or penalties.

█ As to the securities trust agreement, the plaintiff claims power to assess any tax deficiencies against that

trust because Henry E. Peelle reserved power to "control investments and to alter, modify, amend or *revoke" the trust.* (Italics supplied.)

It also claims that the corpus of the insurance trust may be subject to payment of tax deficiencies or penalties assessed against Inez B. Peelle because she was *"given power to withdraw policies from the trust."* (Italics supplied.)

### The Law Pertaining to the Securities Trust

Section 145 of the New York Real Property Law, McKinney's Consol.Laws, c. 50 provides:

"§ 145. *Effect of power to revoke*

"Where the grantor in a conveyance reserves to himself for his own benefit, an absolute power of revocation, he is to be still deemed the absolute owner of the estate conveyed, so far as the rights of creditors and purchasers are concerned."

In City Bank Farmers Trust Co. v. Cannon, 291 N.Y. 125, at page 133, 51 N.E.2d 674, at page 676, 157 A.L.R. 1424, it was held:

"A settlor who reserves absolute power of modification and revocation possesses all the powers of ownership and for many purposes is treated as the absolute owner of the property held in trust. Thus *section 15 of article 5* of the Real Property Law provides: 'Where the grantor in a conveyance reserves to himself for his own benefit, an absolute power of revocation, he is to be still deemed the absolute owner of the estate conveyed, so far as the rights of creditors and purchasers are concerned.' This section of the Real Property Law is applicable to personalty as well as realty. Matter of Moehring, 154 N.Y. 423, 48 N.E. 818; Matter of Cooksey's Estate, 182 N.Y. 92, 74 N.E. 880."

In In re Schermerhorn's Estate, Sur., 149 N.Y.S. 95, at page 96, it was held:

"The reservation of a power of revocation or resettlement to new.

uses by a settlor of an estate is always his property, and in some cases may amount to a fee simple in the settlor. This is well understood by property lawyers. * * *"

In re Hoyt's Estate, 86 Misc. 696, 149 N.Y.S. 91, is a case similar to the instant action. In Hoyt the settlor transferred property to the New York Trust Company of New York as trustee to be held in trust for the use of her son during his life, and upon his death the principal of the trust fund to be divided among his issue *per stirpes,* reserving unto herself the power to revoke. The court said (149 N.Y.S. at page 94):

"An absolute power of revocation was always regarded in equity, as Chancellor Kent said, as property of the donor, grantor, or the donee or grantee of the power. Section 145, of the Real Property Law, now declares that the reservation for settler's own benefit of a power of revocation is property of the settlor. * * *"

Henry E. Peelle having reserved to himself an absolute power of revocation must be deemed the absolute owner of the securities conveyed under the securities trust agreement, and these securities are subject to the tax liens of the plaintiff as against Peelle. Chase contends that because Peelle is incompetent no one has the power to exercise his power of revocation except a court of competent jurisdiction which it claims this Court is not. Assuming *arguendo* that this Court lacks jurisdiction in an original proceeding pertaining to this issue, there can be no question that it has an ancillary jurisdiction to determine the issue. As was said in Walmac Company v. Isaacs, 1 Cir., 220 F.2d 108, at pages 113–114:

"The doctrine of dependent or ancillary jurisdiction is not capable of exact definition. At least so far as we are aware no court has ever tried to fix its limits with any degree of precision. It springs from the equitable doctrine that a court with jurisdiction of a case may consider

therein subject matter over which it would have no independent jurisdiction whenever such matter must be considered in order to do full justice. * * * "

United States District Courts have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue under the provisions of 28 U.S.C.A. § 1340. The issues pertaining to the trust agreements between Henry E. Peelle and Chase are ancillary to this action against Henry E. Peelle and Inez Beatty Peelle to recover tax delinquencies and, therefore, within the principle of Walmac, supra.

■ Chase also contends that the remaindermen must be made parties to any action in which Henry E. Peelle's power to revoke is exercised and the trusts destroyed and that they be joined as parties to protect Chase against the possibility of double liability. There is no necessity for bringing in the remaindermen. They have no vested interest until the retained powers of Henry E. Peelle as settlor are terminated, and the fact that they are not joined as parties will not subject Chase to double liability because the judgment in this Court will be an effective estoppel to such an action. See City Bank Farmers Trust Co. v. Cannon, supra, and also Jackson v. Tallmadge, 246 N.Y. 133, 139, 158 N.E. 48.

### The Law Pertaining to the Insurance Trust

■ The corpus of the insurance trust fund cannot be invaded for the tax deficiencies of Henry E. Peelle because he divested himself of all right of ownership in or dominion over it. See In re Schermerhorn's Estate, supra. However, it is the law of New York that where a life beneficiary under a trust possesses unlimited powers to invade the trust the life beneficiary is the absolute owner of the corpus of the trust. As was said in Ullman v. Cameron, 186 N.Y. 339, 346, 78 N.E. 1074, 1076:

"In Hallett v. Thompson [5 Paige, N.Y., 583], Chancellor Walworth declared that it was 'contrary to sound public policy to permit a person to have the absolute and uncontrolled ownership of property for his own purposes, and to be able at the same time to keep it from his creditors.' That case was cited and the language of the chancellor substantially quoted with approval by Judge Rapallo in Williams v. Thorn, 70 N.Y. 270, 273, and it has received the approval of many courts in this state and elsewhere. The doctrine is sound and applies to this case, for, as to my creditors, property is mine which becomes mine for the asking, and no words can make an instrument strong enough to hold it for me, and keep it from them."

Inez Beatty Peelle is a life beneficiary under the insurance trust with unlimited power to withdraw policies. This is an unlimited power to invade the corpus of the trust, and as was said in Ullman v. Cameron, supra, 186 N.Y. at page 345, 78 N.E. at page 1076:

"The law will not endure this when creditors ask its aid to prevent it, but will declare the estate vested as to them as we did in Wendt v. Walsh, 164 N.Y. 154, 58 N.E. 2. * * * "

The insurance trust can be invaded to pay any tax lien found against Inez Beatty Peelle.

By agreement of the parties, the trusts are not to be invaded or resorted to until the plaintiff has exhausted all other assets of Henry E. Peelle and Inez Beatty Peelle.

The plaintiff has not pressed its claim for transferee liability against Inez Beatty Peelle. It offered no evidence to substantiate that particular contention. There can be, therefore, no transferee liability.

Chase contends that if the trusts be invaded it is entitled to fees and commissions as provided in the trust agreements. The Court sees no reason for making any decision on this point at this time as it is improbable for the tax assessment to wipe out the trust agree-

ments in their entirety. This application can be made at a later date.

Submit findings of fact and conclusions of law in accordance with this decision.